UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALERE INC., ALERE SWITZERLAND GmbH, and SPD SWISS PRECISION DIAGNOSTICS GmbH,<br><br>    Plaintiffs,<br><br>v.<br><br>CHURCH & DWIGHT CO., INC.,<br><br>    Defendant. | Civil Action No. 10-10027 (DPW) |

# MOTION TO DISQUALIFY GOODWIN PROCTER LLP

**TABLE OF CONTENTS**

I.   INTRODUCTION ............................................................................................... 1

II.  FACTUAL BACKGROUND .............................................................................. 2

III. THE CONFIDENTIAL INFORMATION DISCLOSED TO KLINE
     AND GREENHALGH WHILE THEY WERE REPRESENTING
     CHURCH AND DWIGHT IS MATERIAL TO THIS LAWSUIT ................... 3

IV.  THE APPLICABLE RULES AND RELEVANT CASE LAW ........................ 6

V.   CONCLUSION ................................................................................................. 13

# TABLE OF AUTHORITIES

**Cases**

*American Airlines v. Sheppard*,
  96 Cal. App. 4th 1017 (Cal. App. 2d Dist. 2002) ........................................................... 9

*Inverness Medical Switzerland GmbH, et al. v. Acon Laboratories, Inc.*,
  2005 U.S. Dist. LEXIS 12332 (D. Mass. June 23, 2005)………………………………..11

*Smith & Nephew, Inc. v. Ethicon, Inc.*,
  98 F. Supp 106 (D. Mass. 2000) .......................................................................... 11, 12

*U.S. Filter Corp. v. Ionics, Inc.*,
  189 F.R.D. 26 (D. Mass. 1999) ................................................................................ 12

**Statutes**

ABA Model Rule of Professional Conduct 1.10 ................................................................. 9

Massachusetts Rule of Professional Conduct 1.6 ............................................................. 10

Massachusetts Rule of Professional Conduct 1.9 .............................................. 7, 8, 10, 12

Massachusetts Rule of Professional Conduct 1.10 ........................................... 7, 9, 10, 12

Local Rule of the U.S. District Court for the District of Massachusetts 86.6…………….6

I.     **INTRODUCTION**

Defendant Church & Dwight Co., Inc. ("C&D") moves to disqualify Plaintiffs' co-counsel, Goodwin Procter LLP ("Goodwin") because Goodwin's involvement in the case on behalf of Plaintiffs is tainted by a clear and substantial conflict of interest. The conflict arises because Goodwin has had access to confidential client information communicated to Goodwin partners Douglas Kline ("Kline") and Duncan Greenhalgh ("Greenhalgh") when they represented C&D in a matter substantially related to this action while they were partners at their former law firm.

C&D does not make this motion lightly. Indeed, from the outset of this case, Plaintiffs have been represented by Hogan Lovells, a firm which resulted from the merger of Hogan & Hartson and Lovells. For many years, Hogan & Hartson had represented C&D in significant regulatory and other matters. Nonetheless, C&D raised no objection to Hogan Lovells representing Plaintiffs in this action, even though certain of the same attorneys who had been counsel to C&D before the merger became partners in the merged firm. However, when Goodwin suddenly appeared as Plaintiffs' co-counsel in February 2011 – thirteen months after the case began – it became apparent that Plaintiffs would have access to C&D's confidential information directly related to the issues here. That concern was brought to the attention of Goodwin in March 2011. On April 11, 2011, Goodwin informed C&D that it would not voluntarily withdraw, leaving C&D no choice but to move for its disqualification. Respectfully, as we will show below, the relevant legal and ethical standards require that C&D's motion be granted. Such relief will not only protect the legitimate interests of C&D but also the integrity of this proceeding.

1

## II. FACTUAL BACKGROUND

Both Kline and Greenhalgh are currently associated with Goodwin. Before they joined Goodwin Procter, Kline and Greenhalgh were, respectively, partner and senior associate at Testa, Hurwitz & Thibeault LLP ("Testa") until late 2004. During their association with Testa, Kline and Greenhalgh both directly represented C&D in a matter that is substantially related to the current lawsuit.

Specifically, Kline's and Greenhalgh's representation of C&D included, among other things, an in-person meeting in October of 2004 with C&D's Dr. Albert Nazareth ("Dr. Nazareth"), Dr. Nazareth's supervisor, Dr. Alison Lukacsko ("Dr. Lukacsko"), and C&D's in-house patent counsel Steve Shear ("Attorney Shear"). (Declaration of Dr. Albert Nazareth ("Nazareth Dec.") at ¶3.) At the time of the meeting, Dr. Nazareth was a senior scientist at C&D where he was involved with, among other things, designing C&D's consumer pregnancy and ovulation predictor test products, such as C&D's FIRST RESPONSE® product. (*Id.* at ¶¶ 1-2.) In 2004, Attorney Shear's duties included, among others, managing intellectual property issues relating to C&D's consumer pregnancy and ovulation predictor test products.

During the meeting in October of 2004, both Kline and Greenhalgh received, directly from Dr. Nazareth, confidential information of C&D that included the features of the software algorithm to be used in C&D's digital consumer pregnancy test products. (*Id.* at ¶4.) Those same features are now used in C&D's FIRST RESPONSE® digital pregnancy test products that Plaintiffs have accused of infringing their patents ("Accused Products"), and are directly relevant to contested infringement issues in the current lawsuit. In fact, the confidential subject matter discussed in that meeting likewise bears

on patentability – another set of issues which, like infringement, go to the very heart of the case.

### III. THE CONFIDENTIAL INFORMATION DISCLOSED TO KLINE AND GREENHALGH WHILE THEY WERE REPRESENTING CHURCH AND DWIGHT IS MATERIAL TO THIS LAWSUIT

At their meeting, Kline and Greenhalgh received from Dr. Nazareth a description of how the software algorithm would detect gold particles in the background zone of C&D's digital consumer pregnancy test products.  (*Id.* at ¶4.)  They also received a specific description regarding the manner in which the software algorithm would take the signal reading by subtracting the signal from the background zone from that of the test zone.  (*Id.*)  This confidential information communicated to Kline and Greenhalgh directly relates to noninfringement issues in the case.

During the meeting, Drs. Nazareth and Lukacsko and Attorney Shear also inquired of Kline and Greenhalgh whether one of C&D's pending patent applications could be improved to cover these particular features of the software algorithm as well as the base hardware platform being considered for those features.  (*Id.* at ¶5.)  These same features are now present in the Accused Products.  It is therefore plain that issues relating to the patentability of these features were also addressed.

At a minimum, the confidential information that Kline and Greenhalgh received regarding the algorithm for taking signal readings bears directly on the issue of infringement of the '394 patent.  As expressly laid out in C&D's noninfringement contentions for that patent and foreshadowed by its claim construction briefs, C&D asserts that the manner in which the signal reading is taken establishes that it is not infringing the '394 patent.  (*See* C&D's Noninfringement Contention for U.S. Pat. No. 7,239,394 at Pages 1-2.)  In particular, C&D asserts that the '394 patent requires a

computational circuit responsive to a signal representing the amount of an analyte or the rate of accumulation of an analyte, but that a signal reading obtained by subtracting the background zone signal from the test zone signal – *i.e.*, the very algorithm to which Kline and Greenhalgh became privy as a result of their representation of C&D – does not infringe as a matter of law. (*Id.*)

Indeed, both parties' opening claim construction briefs indicate that the algorithm for taking signal readings is one of several dispositive noninfringement defenses to the '394 patent. For example, both parties contest the construction of the term "signal representing the amount of an analyte." Plaintiffs argue that the term's meaning can include a reading taken by subtracting measurements taken in different zones. (Plaintiffs' Opening Claim Construction Brief at Page 10; Plaintiffs' Responsive Claim Construction Brief at Pages 3-4.) C&D argues that the claims refer to a value indicative of the amount of signal representing the amount of analyte in the detection zone alone and the prior art of record precludes Plaintiffs from even attempting to take a contrary position. (Defendant's Opening Claim Construction Brief at Pages 10-11; Defendant's Responsive Claim Construction Brief at Page 3.) Consequently, the manner in which the signal readings are taken is one very important feature that can distinguish the software algorithm in the Accused Products from the '394 patent's claims.

The information regarding the algorithm for taking signal readings revealed by Dr. Nazareth to Kline and Greenhalgh is also directly relevant to determining whether the means-plus-function language of the '394 patent claims, such as claim 22, is met. Construing means-plus-function claims requires (1) identifying the claimed function and then (2) determining the structure or the algorithm in the specification that corresponds to

4

the claimed function. Therefore, the differences between the algorithms for taking signal readings that are disclosed in the '394 patent and the one used in the Accused Products (including the very features of the algorithm that Kline and Greenhalgh obtained through their representation of C&D) lie at the heart of one of the infringement issues in the current litigation.

The confidential information that Kline and Greenhalgh received regarding the detection of gold particles is also directly relevant to the current lawsuit's issue of whether C&D's FIRST RESPONSE® product infringes the '532 patent. As expressly described in C&D's noninfringement contentions for the '532 patent, one of C&D's positions is that the '532 patent requires an algorithm that determines the sample liquid's flow rate in order to discern whether a sufficient amount of sample liquid was applied. (C&D's Noninfringement Contention for U.S. Pat. No. 7,317,532 at Pages 1-2.) Specifically, it is C&D's position that the '532 patent requires an algorithm that (1) detects the presence of the sample liquid in the first and second zones of the test strip, (2) measures the time it took for the sample liquid to flow from the first zone to the second zone, and (3) uses the measured time to calculate the actual flow rate, *i.e.*, speed, of sample liquid's flow. (*Id.*)

C&D's FIRST RESPONSE® product detects the presence of a sufficient amount of gold particles in the first zone. (*Id.*) Only after it determines that the amount of gold particles detected in the first zone is sufficient, will the algorithm start a timer and monitor the second zone for presence of the sample fluid within a certain amount of time. (*Id.*) C&D asserts that the algorithm used in the Accused Products to detect gold particles – elements of which Kline and Greenhalgh received in 2004 through their

5

representation of C&D – bears directly on why the Accused Products do not infringe the '532 patent.

The materiality of the gold particle detection algorithm in the Accused Products is evidenced by both parties' opening claim construction briefs. Plaintiffs argue that the '532 patent claim term "determining a flow rate of the liquid" means determining the time it takes the liquid to travel a known distance. (Plaintiffs' Opening Claim Construction Brief at Pages 25-26; Plaintiffs' Responsive Claim Construction Brief at Pages 19-20.) On the other hand, C&D argues that it means determining the speed of flow of the sample liquid, *i.e.*, distance / time. (Defendant's Opening Claim Construction Brief at Pages 27-29; Defendant's Responsive Claim Construction Brief at Pages 18-19.) If the Court were to adopt Plaintiffs' construction, the issue of infringement of the '532 patent will include, among other things, consideration of the Accused Products' algorithm for detecting gold particles and for detecting sample fluid, which is, again, the very information to which Kline and Greenhalgh became privy as a result of their representation of C&D.

Therefore, the confidential information that Kline and Greenhalgh received through their representation of C&D, including the above-described features of the software algorithm that were eventually used in the Accused Products, involved concepts and ideas now directly at issue in this litigation.

## IV. THE APPLICABLE RULES AND RELEVANT CASE LAW

Pursuant to Local Rule 86.6(4)(B), the ethical requirements and rules applicable in the U.S. District Court for the District of Massachusetts are the Rules of Professional Conduct ("RPC") adopted by the Massachusetts Supreme Judicial Court embodied in

Rules 3.07. The Rules of Professional Conduct and case law applicable to this situation and motion are RPC 1.9 and RPC 1.10. The provisions of RPC 1.9 state as follows:

> (a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation.
>
> (b) A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client
>
>> (1) whose interests are materially adverse to that person; and
>>
>> (2) about whom the lawyer had acquired information protected by Rules 1.6 and 1.9 (c) that is material to the matter, unless the former client consents after consultation.
>
> (c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter, unless the former client consents after consultation:
>
>> (1) use confidential information relating to the representation to the disadvantage of the former client, to the lawyer's advantage, or to the advantage of a third person, except as Rule 1.6, Rule 3.3, or Rule 4.1 would permit or require with respect to a client; or
>>
>> (2) reveal confidential information relating to the representation except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client.

As described in Part I above, while at Testa, Kline and Greenhalgh represented C&D in regard to the Accused Products and the technology embodied and reflected in those products. Accordingly, all three sections of RPC 1.9 apply to them. That is because Plaintiffs' allegations of patent infringement are (1) directly adverse to C&D, and (2) are substantially related to Kline's and Greenhalgh's prior representation of C&D. In their consultation with Dr. Nazareth, Dr. Lukacsko, and Attorney Shear, they received confidential C&D information relating to the Accused Products, the technology

7

embodied in those products, the patentability of that technology, and the scope of patent protection that could be obtained for that technology. As a result, Subsections 1.9(a) and (b) prohibit them from representing Plaintiffs in this action, and Subsection 1.9(c) prohibits Kline and Greenhalgh from revealing any of C&D's confidential information and from using it to the disadvantage of C&D.

In its letter refusing C&D's request that it voluntarily withdraw its appearance as Plaintiffs' counsel, Goodwin made a perfunctory attempt to claim that Plaintiffs' patent infringement action against C&D is not "substantially related" to Kline's and Greenhalgh's representation of C&D in regard to the technology at issue here. But the facts speak for themselves, and as Dr. Nazareth's declaration shows and the introduction to this motion explains in detail, the issues addressed in Kline's and Greenhalgh's consultation with C&D were the same as those at issue in this litigation. The official commentary to RPC 1.9 speaks to the issue of which side bears the burden of proving whether the current representation is substantially related to a conflicting, earlier representation. Paragraph 7 of that Comment states that "[i]n such an inquiry, the burden of proof should rest upon the firm whose disqualification is sought." Given the facts as described above, Goodwin cannot meet that burden.

Goodwin may assert that Kline and Greenhalgh are not involved in representing Plaintiffs in this case, and it may ask C&D to rely on its promise that they will not disclose to anyone at Goodwin who will be active in the case any of the confidential information to which they have had access by virtue of their past representation of C&D and their consultation with Dr. Nazareth. But that does not remove the taint that Goodwin brings to this matter by the conflicting past representation of C&D by two of its

8

patent lawyers. Similar assurances articulated by a firm accused of conflict and breach of fiduciary duty in *American Airlines v. Sheppard*, 96 Cal. App. 4th 1017 (Cal. App. 2d Dist. 2002) did not satisfy the court, which held in colorful, metaphorical terms as follows:

> [it] was not necessary for American to establish that [its former lawyer revealed] confidential information, in order to prove that [the lawyer] breached his fiduciary duty to American. He placed the noose around American's neck, without its consent, promising all the while not to kick over the chair on which it stood, blithely ignoring the sweat forming on the corporate brow….We do not doubt that [he] believed he could maintain his client's confidence, but American simply does not have to take his word for it. *Id.*, at 1043.

To address the taint that a conflict of interest can bring to an action and to deal with the risk to former clients like C&D that the confidential information they provided to their lawyers may be intentionally or negligently made available to their adversaries at some later date when those lawyers no longer represent them, the imputation rules of the RPC were adopted. RPC 1.10 (a), entitled "Imputed Disqualification: General Rule", provides as follows:

> (a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.8(c), or 1.9.

This Rule imputes to every lawyer at Goodwin the personal conflict of Kline and Greenhalgh, and requires the disqualification of the Goodwin firm. Goodwin cannot escape this disqualification by unilaterally implementing an ethical screen at an unspecified point in time and promising that Kline and Greenhalgh, who have received confidential information from C&D in their direct, personal consultation with key C&D personnel, will be walled-off from other lawyers in the firm. While the ABA a few years ago adopted a revision to its Model Rule 1.10 that adds a subsection that would permit

9

such "non-consensual screening" to avoid former client imputed conflicts of interest. Pointedly, Massachusetts is *not* among them.

Put simply, Goodwin can avoid disqualification only if it fits within one of the two narrow exceptions or "safe harbors" contained in subsection (d) of RPC 1.10. That Rule provides as follows:

> (d) When a lawyer becomes associated with a firm, the firm may not undertake to or continue to represent a person in a matter that the firm knows or reasonably should know is the same or substantially related to a matter in which the newly associated lawyer (the "personally disqualified lawyer"), or a firm with which that lawyer was associated, had previously represented a client whose interests are materially adverse to that person unless:
>
> > (1) the personally disqualified lawyer has no information protected by Rule 1.6 or Rule 1.9 that is material to the matter ("material information"); or
> >
> > (2) the personally disqualified lawyer (i) had neither substantial involvement nor substantial material information relating to the matter and (ii) is screened from any participation in the matter in accordance with paragraph (e) of this Rule and is apportioned no part of the fee therefrom.

In light of the facts set forth in the accompanying Dr. Nazareth's declaration and further described above, Goodwin cannot in good faith sustain its burden of proving that Kline and Greenhalgh had "no information protected by Rule 1.6 or 1.9 that is material to the matter." Therefore, it cannot possibly fit Kline and Greenhalgh within subdivision (d)(1) of RPC 1.10.

Nor, under any fair reading of the evidence, can Goodwin fit Kline and Greenhalgh within subdivision (d)(2) of RPC 1.10. Both Kline and Greenhalgh participated in the consultation with C&D described in Dr. Nazareth's declaration. That consultation gave them both direct and personal access to information about the products that have now been accused in this action, and about the technology embodied and

10

reflected in those products. This access occurred because C&D was seeking advice concerning the patentability of that technology and the scope of patent protection to which that technology might be entitled. This personal consultation with key professionals of C&D cannot be characterized as anything less than "substantial involvement" in the representation of C&D in regard to the technology of the accused products. And as the fact section above explains, the information disclosed to Kline and Greenhalgh by C&D cannot be characterized as anything less than substantial material information.[1]

The situation before the court in *Smith & Nephew, Inc. v. Ethicon, Inc.,* 98 F. Supp 106 (D. Mass. 2000) contained instructive and persuasive parallels to the facts of this case. There, Judge Sterns disqualified Fish & Richardson P.C. ("Fish") in an action in which ownership of patents for "suture anchors" was at issue. The disqualification was based on the fact that Blair Perry, "of counsel" at Fish, had 15 years earlier, while he was a partner in Hale and Dorr, represented the two individual defendants who had invented the suture anchors covered by the subject patents. That representation involved the inventors' employment and consultancy contracts with corporate predecessors of Plaintiff. Among the terms of those contracts were "invention-retention clauses" pertaining to any invention involving "self-activated surgical staples." Even though Attorney Perry was semi-retired and in Florida, his status as "of counsel" to Fish caused

---

[1] Six years ago, Goodwin successfully defeated a motion to disqualify it based on a conflicting former representation by these very same Goodwin partners, Kline and Greenhalgh, in *Inverness Medical Switzerland GmbH, et al. v. Acon Laboratories, Inc.,* 2005 U.S. Dist. LEXIS 12332 (D. Mass. June 23, 2005). However, in that case, the court found that Goodwin had met its burden of proving that neither Kline nor Greenhalgh had been involved in other than a very superficial way in the representation by their prior firm of the party seeking to disqualify Goodwin, and that neither of them had received any confidential information about that representation.

11

his prior representation of the inventors to be imputed to the firm, leading the court to order its disqualification.

In his decision, Judge Sterns worked his way through an analysis and application of RPC 1.9 and 1.10 similar to the analysis set forth above with respect to Goodwin partners Kline and Greenhalgh and their prior representation of C&D.  Notably, the prior, conflicting representation of the inventors in *Ethicon* occurred before the subject patents were issued, and even before the inventions were conceived.  Judge Sterns nonetheless found that this fact did not prevent that prior representation from being "substantially related" to the dispute over ownership of those patents fifteen years later.  *Ethicon*, 98 F.Supp at 110.  The parallel to the instant case is clear.  The fact that the patents Plaintiffs are asserting against C&D were not issued until after the consultation by Dr. Nazareth, Dr. Lukacsko, and Attorney Shear with Kline and Greenhalgh does not detract from the fact that that consultation was substantially related to the patent infringement issues in this case.

Judge Sterns also rightly brushed aside the fact that Fish had erected an "ethical wall" to screen its counsel Perry from any involvement in the patent ownership dispute or communications about it with the Fish trial team.  The court explained that

> Because predicate (i) of exception (d)(2) [of RPC 1.10] is not satisfied, the imperviousness of the "Chinese Wall" that F&R has erected between Perry and the attorneys litigating this case is irrelevant. *See U.S. Filter Corp. v. Ionics, Inc.*, 189 F.R.D. 26, 30 (D. Mass. 1999)

*Ethicon*, 98 F.Supp at 110-11 n.10.  As explained above, the attempt to eliminate an imputed conflict by unilaterally erecting an ethical screen is ineffective under RPC 1.10 (d) in cases in which the prior, conflicting representation involved access to confidential

client information by the attorneys involved in that representation. That was the situation in *Ethicon*, and that is the situation here.

## V.  CONCLUSION

As shown above, the conflict in this case is blatant and the risk of C&D's confidential information being used to its disadvantage is grave. Under the relevant ethical and legal standards, Goodwin must be disqualified. Such relief is necessary to prevent substantial prejudice to C&D and the integrity of this proceeding.

Conversely, Plaintiffs, here, would not be prejudiced by the disqualification of Goodwin since they have been represented (and continue to be represented) by experienced and accomplished patent counsel at the multinational law firm of Hogan Lovells. Hogan Lovells has been lead counsel for Plaintiffs since the inception of this lawsuit in January 2010. Hogan Lovells has taken the lead in every discussion with counsel for C&D on issues relating to the merits of the case (*e.g.,* claim construction) as well as on issues concerning discovery; it has appeared before the Court at the initial conference; and it has appeared as lead counsel on every paper filed with the Court. In contrast, Goodwin first appeared in the action in February 2011, over one year after Plaintiffs filed this case.

For the forgoing reasons, C&D respectfully requests that its within motion to disqualify Goodwin as co-counsel for Plaintiffs be granted in all respects.

Dated:  May 6, 2011               Respectfully submitted,

*/s/ James H. Shalek*
James H. Shalek*
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York  10036-8299
Tel:  212.969.3000
Email:  jshalek@proskauer.com

* admitted *pro hac vice*

-- and --

J. Charles Mokriski (BBO # 560239)
PROSKAUER ROSE LLP
One International Place
Boston, MA  02110
Tel:  617.5269600
Fax:  617.526.9899
Email:  jcmokriski@proskauer.com

*Attorneys for Defendant-Counterclaim Plaintiff Church & Dwight Co., Inc.*

## Certificate of Service

The undersigned hereby certifies that this document was filed through the ECF system on May 6, 2011 and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ James H. Shalek*
James H. Shalek
