UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ALERE INC., ALERE SWITZERLAND )
GMBH, and SPD SWISS PRECISION )
DIAGNOSTICS GMBH, )
                                )
            Plaintiffs,    )    Civil Action NO.
                                )    10-10027-DPW
        v.                 )
                                )
CHURCH & DWIGHT COMPANY,   )
INC.,                      )
                                )
            Defendant.     )

MEMORANDUM AND ORDER
March 31, 2012

Plaintiffs Alere Inc., Alere Switzerland GmbH, and SPD Swiss

Precision Diagnostics GmbH have accused Church & Dwight Company,

Inc. of infringing three patents related to assay result reading

devices for the home testing of analytes, for example in home

pregnancy tests.  Church & Dwight has moved for the

disqualification of Alere's co-counsel, Goodwin Procter LLP.

Church & Dwight alleges that Goodwin partners Douglas Kline and

Duncan Greenhalgh obtained access to confidential client

information about Church & Dwight while associated with another

law firm and argues that Goodwin should therefore be disqualified

from representing Alere under Massachusetts Rule of Professional

Conduct 1.10, generally known as the Imputed Disqualification

Rule.

I.   BACKGROUND

Prior to joining Goodwin in January of 2005, Kline and Greenhalgh were affiliated with Testa, Hurwitz & Thibeault.  At Testa, Kline and Greenhalgh represented Church & Dwight with respect to certain intellectual property matters.

As the fundamental factual ground for the instant motion, Church & Dwight relies on a meeting that appears to have occurred in October, 2004, involving Kline and Greenhalgh and Church & Dwight employees Dr. Albert Nazareth, Dr. Alison Lukacsko, and in-house counsel Steve Shear.  According to Dr. Nazareth, during the day-long meeting he described to Kline and Greenhalgh the features of a software algorithm which was to be employed in a digital pregnancy test kit Church & Dwight was developing.  These features "includ[ed] the manner in which gold would be detected and the subtraction of the background in taking the signal readings used in that algorithm."  The features described during that meeting are allegedly used in the Church & Dwight digital pregnancy test accused of infringing Alere's patents now before me.

Dr. Nazareth further states in his declaration that, at the time of the October, 2004, meeting, Church & Dwight already had a patent application pending for a digital pregnancy test.  At the meeting, he discussed with Kline and Greenhalgh whether the pending application could be improved and whether the features of

2

the software algorithm he described, as well as a base hardware platform, could be covered by the application's claims.

Kline and Greenhalgh have submitted declarations in which they state that they have no recollection of the meeting described by Dr. Nazareth, although they have no reason to dispute the fact that such a meeting occurred.  They also aver that they have not discussed the meeting or the content of any conversations which may have occurred during that meeting with anyone at Goodwin, other than Henry Dinger, the chair of the firm's Ethics Advisory Committee, and each other.  Kline and Greenhalgh do remember working on patent-related matters for Church & Dwight, and Greenhalgh recalls reviewing a patent related to digital pregnancy tests which had been prepared by another law firm.

The patent application that appears to have been discussed at the October, 2004, meeting was published by the Patent Office in 2006.  In the course of discovery, on May 12, 2010, Church & Dwight produced the algorithm used in the accused pregnancy kit. Additionally, on November 23, 2010, Church & Dwight served on Alere their Preliminary Invalidity and Non-Infringement Disclosures, without designating the documents as confidential. The Non-Infringment Contentions disclose some aspects of the software algorithms used in the accused device.

The instant action was filed on January 8, 2010, by Alere

(then known as Inverness Medical Innovations, Inc.), represented

by Clements & Pineault, LLP, as local counsel.  Attorneys from

the law firm of Lovells, LLP (later Hogan Lovells US LLP) were

subsequently granted leave to appear *pro hac vice* on behalf of

Alere.  On February 7, 2011, attorneys from Goodwin also made an

appearance on behalf of Alere.  According to Alere, Goodwin was

retained in November of 2010.  Goodwin presents affidavits to the

effect that neither Kline nor Greenhalgh is involved in the case

and that the two attorneys have been "screened" from this

litigation.

## II.  ANALYSIS

In Massachusetts, "'[d]isqualification, as a prophylactic

device for protecting the attorney-client relationship, is a

drastic measure which courts should hesitate to impose except

when absolutely necessary.'"  *Adoption of Erica*, 686 N.E.2d 967,

970 (Mass. 1997) (quoting *Freeman v. Chicago Musical Instrument

Co.*, 689 F.2d 715, 721 (7th Cir. 1982)).  However, "an

individual's right to counsel of his choice" must be reconciled

"with the obligation of maintaining the highest standards of

professional conduct and the scrupulous administration of

justice."  *Rodriguez v. Montalvo*, 337 F.Supp.2d 212, 217 (D.

Mass. 2004).

The District of Massachusetts has adopted the "ethical

requirements and rules concerning the practice of law of the

Commonwealth of Massachusetts."  LR 83.6(4)(B) (2012).  These

requirements and rules include the Massachusetts Rules of

Professional Conduct codified in Rule 3.07 of the Rules of the

Massachusetts Supreme Judicial Court.  The relevant Massachusetts

Rule of Professional Conduct, Rule 1.10(d), the Imputed

Disqualification Rule, provides:

> (d) When a lawyer becomes associated with a firm, the firm
> may not undertake to or continue to represent a person in a
> matter that the firm knows or reasonably should know is the
> same or substantially related to a matter in which the newly
> associated lawyer (the 'personally disqualified lawyer'), or
> a firm with which that lawyer was associated, had previously
> represented a client whose interests are materially adverse
> to that person unless:
>
> > (1) the personally disqualified lawyer has no
> > information protected by Rule 1.6 or Rule 1.9 that is
> > material to the matter ('material information'); or
> >
> > (2) the personally disqualified lawyer (i) had neither
> > substantial involvement nor substantial material
> > information relating to the matter and (ii) is screened
> > from any participation in the matter in accordance with
> > paragraph (e) of this Rule and is apportioned no part
> > of the fee therefrom.

The parties dispute whether Kline and Greenhalgh's representation

of Church & Dwight is "substantially related" to the present

matter and whether either of the two "safe harbor" provisions

within Rule 1.10(d) applies.

## A.   *"Substantially Related" Matter*

As a threshold matter, Rule 1.10 is only implicated if the

prior matter handled by Kline and Greenhalgh is "substantially

related" to the matter at hand.  "In a conflict of interest

situation, which is what defendant asserts here, the relevant
inquiry is whether the subject matter of the two representations
is 'substantially related'; could the attorney have obtained
confidential information in the first suit that would have been
relevant to the second."  *Borges v. Our Lady of the Sea Corp.*,
935 F.2d 436, 439-40 (1st Cir. 1991); *Rodriguez*, 337 F. Supp. 2d
at 217-219.

"Where the primary purpose of the 'substantially related'
test is to preserve client confidences by avoiding an
'intolerably strong temptation' to betray them, the assessment of
whether matters are 'substantially related' must focus on whether
the overlap or similarity between the two matters would
potentially give rise to such a 'temptation.'" *ebix.com, Inc. v.
McCracken*, 312 F. Supp. 2d 82, 89 (D. Mass. 2004) (quoting *Dee v.
Conference Holdings, Inc.*, No. 976608, 1998 WL 1247926, *2 (Mass.
Super. July 14, 1998)).  "[T]he court should focus on whether the
relationship between the two matters is such that it is
reasonable to assume that confidential information would have
been given to the attorney in the first matter that would be
helpful to the adverse client in the second matter."  *Dee*, 1998
WL 1247926 at *2.  Where two matters are factually and legally
distinct, courts will not find substantial relation.  *See, e.g.,
Robinson v. Bodoff*, 382 F. Supp. 2d 229, 232-233 (D. Mass. 2005);
*National Medical Care, Inc. v. Home Medical of America, Inc.*, No.

00-1225, 2002 WL 31068413, *7 (Mass. Super. Sept. 12, 2002).

Church & Dwight bears the burden of demonstrating that the two matters are "substantially related." *See ebix.com, Inc.*, 312 F. Supp. 2d at 90 ("[U]nder the substantial relationship test . . . the burden lies with the former client"); *Bays v. Theran*, 639 N.E.2d 720, 723 (Mass. 1994) ("The [former] client . . . must prove only the existence of the tempting *situation*") (alterations in original); *Bd. of Trs. of 447 Marlborough St. Condominium Trust v. Corben*, 900 N.E.2d 913 (Table), 2009 WL 311151, *1 (Mass. App. Ct. 2009) ("[T]he moving party must prove" that "a lawyer has violated the 'substantial relationship' test").[1]

Church & Dwight argues that the two matters are

---

[1]   Church & Dwight argues that the burden of proving lack of substantial relatedness lies with the firm whose disqualification is sought.  In doing so, Church & Dwight relies on Comment 7 to Rule 1.9, the Direct Disqualification Rule, which describes the burden of proof under Rule 1.9(b) but does not discuss the burden of proof regarding substantial relatedness under Rule 1.10. Notably, Comment 7 relates to Rule 1.9(b) alone and does not discuss Rule 1.9(a), which also specifies substantial relatedness as a threshold matter.  Comment 7 is also located in a section labeled "Confidentiality."  The placement of and specificity within the Comment suggest that the burden discussed in Comment 7 refers to a separate and distinct burden under Rule 1.9(b)-- regarding whether the particular lawyer acquired confidential information--and not to the burden regarding substantial relatedness.  In any event, I need not decide questions of burdens under Rule 1.9(b) for the purpose of the motion before me now.  Church & Dwight's citation of Comment 7 to Rule 1.9 is not prescriptive in the context of substantial relatedness under Rule 1.10(d).  Church & Dwight cites not a single case--and my research has found none--countering the body of case law holding that the burden in this context rests upon the former client.

substantially related because Kline and Greenhalgh received
information about the functionality of the pregnancy test at
issue in the instant litigation and specifically about the method
used by the test to take signal readings.  Church & Dwight
contends that such information is directly relevant to whether
the pregnancy test infringes the function claimed in Claim 22 of
U.S. Patent No. 7,239,394 for determining the rate of signal
accumulation and Church & Dwight's noninfringement contentions
with respect to U.S Patent No. 7,317,532 with respect to the
determination of flow rate.

Goodwin contends that the two matters are not substantially
related because no material information that is still
confidential was shared during the October, 2004, meeting.
Specific evidence regarding the sharing of material confidences,
however, is properly addressed within the context of the safe
harbor provisions and not within the substantial relatedness
analysis.  The Supreme Judicial Court has held that "the
'substantial relationship' test operates by assuming that
confidences were transmitted in the former attorney-client
relationship."  *Bays v. Theran*, 639 N.E.2d 720, 724 (Mass. 1994).
*See also Mesiti v. DiIanni*, No. 020452BLS, 2003 WL 1962488, *4
(Mass. Super. April 3, 2003) ("[T]his court must assume that
confidences were transmitted in that attorney-client
relationship.").

I find that the evidence from which I draw reasonable inferences supports a finding that the two matters are "substantially related."  The 2004 conversation concerned the patenting of technology which is now incorporated into the accused product.  The factual cores of the two matters overlap significantly, raising the prospect that an attorney involved in both matters would be tempted to use confidential information on behalf of his current client to the detriment of the former client.  Consequently, I conclude that the two matters are substantially related.

### B.     *The Safe Harbor Provisions and the Burden of Proof*

Rule 1.10(d) provides two exceptions for the disqualification of a firm: where the personally disqualified lawyer has no confidential, material information, *see* Rule 1.10(d)(1); and where the personally disqualified lawyer had neither substantial involvement nor substantial material information relating to the matter and is screened from any participation in the matter in accordance with Rule 1.10(e), *see* Rule 1.10(d)(2).

In supplemental briefing submitted by letter to the court, Church & Dwight contended that *U.S. Filter Corp. v. Ionics, Inc.*, 189 F.R.D. 26 (D. Mass. 1999), establishes that the personally disqualified attorney has the burden of demonstrating that he fits within the two harbors.  The decision states that the

personally disqualified attorney "can overcome the 'Imputed

Disqualification' Rule only if he satisfies at least one of the

two exceptions listed as MRPC 1.10(d)(1) and MRPC 1.10(d)(2)."

*U.S. Filter Corp.*, 189 F.R.D. at 29.  This wording, however, is

hardly explicit that the decision is discussing the  burden of

proof, as opposed to merely expressing that Rule 1.10(d) requires

imputed disqualification unless one of the two exceptions

applies.

At least one decision from a judge of this court explicitly

holds that the firm at risk of disqualification has the burden of

establishing that the safe harbor provision of Rule 1.10(d)(1)

applies.  *See Inverness Med. Switz. GmbH v. Acon Labs.*, Civil

Action No. 03-11323-PBS, Civil Action No. 02-12303-PBS, 2005 U.S.

Dist. LEXIS 12332, *14 (D. Mass. June 23, 2005).  In *Inverness*,

Judge Saris relied on Comment 7 to Rule 1.9, which relates, as

noted above, *supra* Note 1, to the burden under Rule 1.9(b). And,

as noted, Comment 7 does not purport to apply to other Rules or

even to other sections within Rule 1.9.  Nevertheless, the

analogy implicitly drawn by Judge Saris between the two rules

seems reasonable.  Once the potential for conflict is

established, just as the burden of proof regarding the sharing of

confidential information should fall on the firm facing

disqualification in the direct conflict of interest context so

also should the burden fall on the potentially disqualified firm

in the imputed disqualification context.

It is a reasonable allocation of responsibilities that the potentially disqualified firm should bear the burden of proof regarding the applicability of either safe harbor in Rule 1.10(d).  Especially in a setting where there is seldom full discovery practice, it is practical to place the burden of proof on the party who likely has possession of the facts.[2]  Here, while the moving party can properly be called upon to show the substantial relatedness of the two matters, the potentially disqualified firm can properly be called upon to demonstrate whether the personally disqualified lawyer acquired confidential and material information or whether the lawyer had substantial involvement in the matter at issue and substantial confidential, material information relating to the matter.

For instance, where the subject lawyer in an imputed disqualification dispute did not represent the moving party before joining a new firm, but instead another member of the lawyer's former firm provided representation, the lawyer at issue is much more likely to be able to adduce evidence regarding whether and to what extent he discussed the case with the

---

[2] In addressing the question of burden of proof in this case under Rule 1.10(d), I am not required to make any distinction between the burden of production and the burden of persuasion. This is because, as will appear below, the outcome of the analysis does not turn on the allocation of the burdens but rather on the substantiality of the proof upon which I rely in making my findings and conclusions.

representing lawyer, whether records were shared, etc.   The

moving party might only know that another lawyer at the former

firm provided representation and have no knowledge about the

extent of the potentially disqualified lawyer's participation in

the matter.   In short, the potentially disqualified lawyer is

much more likely to develop the evidence whether a safe harbor

exception applies.

Although the parties briefed the issue of burden of proof

and discussed it at oral argument, they have not offered any case

that suggests the matter is definitively settled in

Massachusetts.   Without the benefit of controlling direction

supporting one interpretation or the other, I will (1) analogize

between Rule 1.9(b) and Rule 1.10(d) and (2) accommodate the

practical concerns of access to evidence.   I therefore hold that

the burden of proof of establishing the applicability of the safe

harbors within Rule 1.10(d) falls on Goodwin, the potentially

disqualified firm.

### C. Rule 1.10(d)(1)

The first safe harbor, provided in Rule 1.10(d)(1),

addresses the accuracy of the assumption implicitly made in the

substantial relationship test, eliminating from disqualification

those lawyers who have *no* confidential information that is

material to the matter.   For the reasons discussed in connection

with the question of substantial relatedness in Section II.A.

12

above and drawing the reasonable inferences presented in the factual circumstances of this case, I cannot find it to be more likely than not that Kline and Greenhalgh have *no* confidential information material to this matter.

### D.    Rule 1.10(d)(2)

The burden of proof becomes more salient in this case when addressing the safe harbor provided in Rule 1.10(d)(2). I find, however, that Goodwin has met its burden of proof with regard to the second safe harbor provision.  The language in Rule 1.10(d)(2), requiring a lawyer from whom disqualification might be imputed to have "neither substantial involvement nor substantial material information relating to the matter" in order to take advantage of the safe harbor, directs "a decisionmaker to make an evaluative rather than bright-line determination. *U.S. Filter Corp.*, 189 F.R.D. at 30.  It requires "an exercise of discretion leading to a single choice after taking into account an array of factors."  *Id*.  Considering the factors at issue in this case, I find that the second safe harbor provision applies.

### 1.    Substantial Involvement

The October, 2004, meeting discussing the technology involving the pregnancy test at issue in this litigation did not constitute substantial involvement in the substance of the instant matter.  Although the conversations in general may have been extensive that day, the involvement of Kline and Greenhalgh

regarding the issues in this case can hardly be described as "substantial."  The general discussions only lasted for one day. Even when the discussions have been more focused on the substance of the matter at issue, a day's engagement has been found insubstantial.  *See O'Donnell v. Robert Half Int'l, Inc.*, 641 F.Supp.2d 84, 87 (D. Mass. 2009) (finding that an associate who spent 7.2 hours on a matter did not have substantial involvement on the matter), *aff'd,* Order, 04-cv-12719, Dkt. No. 180 (D. Mass. Jan. 6, 2010).[3]  More fundamentally, the discussions that took place occurred before the patent that is the subject of the instant case was issued.  While the issues regarding the patentability of Church & Dwight's patent for a related invention are said to have been discussed at the October, 2004, meeting, it does not appear that Kline and Greenhalgh became *substantially* involved in the issues arising in the instant matter before the patent in dispute was issued.

Accordingly, I find that Kline and Greenhalgh did not become substantially involved in the present matter.

2.   Substantial Material Information

I also find that Kline and Greenhalgh did not obtain "substantial material information relating to the matter."

---

[3] In *O'Donnell*, however, the associate's exposure to substantial material information did lead to the disqualification of her new firm.

"Material information" in this context is defined as information protected by Rule 1.6 or Rule 1.9--confidential information--that is material to the matter.  *See* Rule 1.10(d)(1).  While information was likely shared at the time of the meeting, the evidence before me does not suggest that a substantial amount of information was shared that is both confidential and material to the matter at hand.

Goodwin argues that the algorithm allegedly disclosed by Dr. Nazareth in the October, 2004, meeting is no longer confidential because it has been disclosed as part of this litigation and also in U.S. Patent No. 7,763,454 (the "'454 Patent") and related filings.  Thus, Goodwin contends, any information that may be described as both "substantial" and "material" to the instant is not confidential under Rule 1.10(d).

Church & Dwight argues that Goodwin unduly narrows the meaning of "confidential information" by excluding information shared during discovery and in a patent application.  Church & Dwight contends that (1) "paragraphs [5], [5A] and [5B] of the official Comments to Massachusetts Rule 1.6 make clear that the addition of the word 'confidential' before the word 'information' in Rule 1.6(a), which defines the information that the Rule is designed to protect, was put there solely to exclude 'information generally known,'" and (2) production in discovery, statements of position, and the partial disclosures of a published patent

application do not make an algorithm "generally known."

Church & Dwight misconstrues the application of Rule 1.6, Comments 5, 5A, and 5B, to the instant case.  The Comments do clarify that even information obtained in the course of an attorney's representation of a client might not need to be treated as confidential where it is widely available or generally known.  Rule 1.6, Comment 5A.  The Comments also explain that the Rule does not include the words "or is generally known" (as compared to the ABA Model Rule) because "[t]he elimination of such information from the concept of protected information . . . has been achieved more generally throughout the rules by the addition of the word 'confidential' to this rule."  Rule 1.6, Comment 5B.  Thus, the Comments explain that widely known information is generally not confidential.  However, the Comments do not state that every piece of information that is *not* "generally known" *is* confidential.

More specifically, the Comments neither state nor imply that information that is *known to the other party* through discovery or other processes is confidential in the context of the Rule 1.10(d) safe harbors.  Such an interpretation would make little sense.  There is no practical reason to disqualify a firm out of concern that one of its members can be said to share information improperly with the other members where the other members *already know the information*.  This is not to say that in every case

16

discovery obviates the need to follow the ethical rules created
to protect client confidences.  However, where, as here, the
relevant discovery was effectively conducted prior to Goodwin's
entry into the case, where the only arguably substantial
confidential information known to Goodwin lawyers was produced to
Alere's attorneys in that discovery, and where the other
requirements of Rule 1.10(d)(2) are met, I see no purpose or
basis under Rule 1.10(d) to disqualify Goodwin from the case.

Church & Dwight argues that the information shared during
discovery, in party statements, and in the published patent
application does not cover the entire extent of the confidential
information shared with Kline and Greenhalgh.  Church & Dwight
states that Dr. Nazareth not only described the technology at the
meeting but also discussed "whether particular features now
incorporated in the accused products constituted patentable
subject matter that could be embraced by an application owned by
C&D."  Church & Dwight contends that in order to assess
patentability, Kline, Greenhalgh and Dr. Nazareth must have
discussed prior art and validity concerns.  Such discussions,
Church & Dwight argues, are confidential.

Church & Dwight overstates the language of Dr. Nazareth's
affidavit.  Dr. Nazareth stated that he discussed with Kline and
Greenhalgh "whether the pending C&D patent application could be
improved and whether the aforestated features relating to the

17

detection of gold and subtraction of background signals, now contained in the C&D products accused of infringement, as well as the base hardware platform then contemplated for that device, could be included in or otherwise covered by claims of that application."  Dr. Nazareth does not state that they discussed whether the features in the accused product were patentable.  He only states that they discussed whether the features could be included within the claims of a particular pending patent application.  Where Goodwin has shown that the discussion occurred before the issuance of the patent in dispute in the instant case, and where the topic of discussion was another (albeit related) patent, I will not assume, based on Dr. Nazareth's markedly thin affidavit, that substantial confidential information was shared that is material to infringement of the patent in dispute in this case.

Although there is little case law on this point, courts in this District have found that a lawyer has received "substantial material information" only when the facts demonstrate that directly relevant information was disclosed.  For example, in *Smith & Nephew, Inc. v. Ethicon, Inc.*, 98 F.Supp.2d 106 (D. Mass. 2000), the attorney in question had drafted the very contract term, for the opposing party, the interpretation of which was at issue in the subsequent suit.  The court found that this role necessarily led to the conclusion that the attorney had

substantial material information with respect to the contract

term.  *Id.* at 110.  Similarly, in *O'Donnell*, Magistrate Judge

Collings concluded that the material information obtained by an

attorney was "more accurately described as 'substantial' as

opposed to 'insubstantial'" where she received confidential

information as to the strategy of defense of a matter and had

produced a memorandum on a legal issue, even though the total

time spent on the project was not substantial.  *O'Donnell*, 641

F.Supp.2d at 89; *see also United States Filter*, 189 F.R.D. at 29

(finding that a partner in a small firm had substantial

information about a matter because the other partner had

discussed the matter and consulted him on certain issues).

Here, by contrast, the October, 2004, discussion was not

concerned with the patents at issue.  Rather, it concerned Church

& Dwight's technology, which is not confidential information, and

how to incorporate it into a separate patent application.

Although I find that Church & Dwight has raised the possibility

that "material information" was disclosed, I am satisfied the

evidence demonstrates that any such information was not

"substantial."  As a result, I find that Kline and Greenhalgh did

not have substantial material information concerning the

litigation matter now before me.

### 3.   Conclusion of Rule 1.10(d)(2) Analysis

Rule 1.10(d)(2) excludes from disqualification a firm where

the personally disqualified lawyer had neither substantial

involvement nor substantial information relating to the matter,

is screened from any participation in the matter, and is

apportioned no part of the fee therefrom.  Church & Dwight does

not challenge the sufficiency of Goodwin's screening mechanisms

under Rule 1.10(e).  Thus, I find that Goodwin's representation

of Alere meets the requirements of the second safe harbor

provision under Rule 1.10(d)(2).

III.   CONCLUSION

For the reasons set forth more fully above, Church &

Dwight's Motion to Disqualify (Dkt. No. 45) is DENIED.


                              */s/ Douglas P. Woodlock*
                              DOUGLAS P. WOODLOCK
                              UNITED STATES DISTRICT JUDGE